04-831

IN THE SUPREME COURT OF THE STATE OF MONTANA

2007 MT 264

BOBBIE and RON PETERSON,

        Plaintiffs and Appellants,

   v.

THE DOCTORS' COMPANY, an Interinsurance Exchange,

        Defendant, Appellee and Cross-Appellant.

APPEAL FROM:    District Court of the Fourth Judicial District,
In and For the County of Missoula, Cause No. DV 02-491,
Honorable Ed McLean, Presiding Judge

COUNSEL OF RECORD:

        For Appellants:

            E. Craig Daue and Douglas A. Buxbaum, Buxbaum,
Daue & Fitzpatrick, PLLC, Missoula, Montana

        For Appellee:

            Shelton C. Williams and Susan Moriarity Miltko, Williams
Law Firm, P.C., Missoula, Montana

                Submitted on Briefs:  March 22, 2006

                     Decided:  October 22, 2007

Filed:

            _____
                        Clerk

Justice Jim Rice delivered the Opinion of the Court.

¶1     Appellants Bobbie and Ron Peterson (Petersons) appeal from evidentiary orders entered by the Fourth Judicial District Court during the trial of Petersons' claims under the Montana Unfair Trade Practices Act (MUTPA) against Appellee The Doctors' Company (TDC) precluding admission of certain letters and correspondence between attorneys in the underlying malpractice case and allowing TDC to admit a disputed death verdict chart. TDC cross-appeals the District Court's evidentiary orders which precluded its discovery of certain attorney files and excluded evidence of a prior relationship between Petersons and TDC. We affirm in part, reverse in part, and remand for a new trial.

¶2     We consider the following issues on appeal:

¶3     (1) Did the District Court abuse its discretion in excluding as hearsay letters and correspondence written by counsel for the Petersons and received by The Doctors' Company during settlement negotiations of the Petersons' malpractice claims?

¶4     (2) Did the District Court abuse its discretion in admitting a minor death verdicts chart?

¶5     (3) Did the District Court abuse its discretion in refusing to allow discovery of the Petersons' attorneys' files in the underlying action?

¶6     (4) Did the District Court abuse its discretion in excluding all evidence of the previous relationship between Petersons' attorneys and The Doctors' Company?

2

# BACKGROUND

## *A Complicated Pregnancy*

¶7      The Petersons, residents of Anaconda, wanted to have another baby.  Bobbie had previously lost a child in utero and was forty-five years old, so the Petersons knew there were risks and no guarantees.  Still, desiring a child, the Petersons faced the risks and were delighted when they conceived in the fall of 1996.

¶8      The Petersons documented the pregnancy on videotape, and immersed themselves in newborn fever—shopping for baby clothes and preparing a nursery.  They also entrusted their care to Butte Ob-Gyn, Dr. Robert St. John, a Butte physician to whom Bobbie's primary care physician had referred them.  On November 25, 1996, Dr. St. John informed the Petersons that they were not merely having a single child; they were expecting twins.

¶9      Dr. St. John recognized that Bobbie's twin gestation made the already risky pregnancy even riskier, and he communicated those risks to the Petersons.  Unfortunately, precautions could not prevent a low-lying placenta, and a suspected total previa, which St. John diagnosed in January 1997.  Further, an ultrasound performed in February 1997 revealed that one of the twin boys had a cyst on his chest.  Located near the twin's heart, the cyst was not only life threatening for the boy, but also added a further risk to Bobbie's pregnancy.  As a result of the cyst and the other complications, Dr. St. John referred the Petersons to a physician in Salt Lake City, and arranged to have the babies delivered there so that specialists could perform surgery on the imperiled twin immediately after birth.

¶10 Bobbie continued regular appointments with Dr. St. John, including a single appointment with St. John's associate, Dr. Jamieson, throughout March and April of 1997. She appeared stable and in relatively good condition at an appointment with Dr. St. John on May 7, 1997. However, at that appointment, given the inherent risks of Bobbie's pregnancy, Dr. St. John asked to see Bobbie again in two weeks, wanting her to return within a day of May 21, 1997. Unexplainably, however, Dr. St. John's staff scheduled Bobbie's next appointment for May 27, almost three weeks later.

¶11 Over the next couple weeks, Bobbie's condition changed. As expected, her abdomen was very large, but her feet and legs became severely swollen, she was plagued with a chronic cough, experienced frequent nausea and vomiting, and was in significant discomfort. On May 24, days after Dr. St. John had originally wanted to see her, Bobbie experienced shortness of breath which caused her to call Dr. Jamieson, who was on call for Dr. St. John, then on vacation. Dr. Jamieson had once examined Bobbie and had been briefed about Bobbie by Dr. St. John before his departure. Despite Bobbie's known risks, her current symptoms and panicked demeanor, Dr. Jamieson did not believe Bobbie's condition warranted immediate attention that night. Instead, he merely gave Bobbie the option of going to the hospital if she desired to do so. She stayed at home.

¶12 Bobbie awoke to extreme discomfort on May 27. Though she had an appointment scheduled for 4:15 p.m. that day, she called Dr. St. John's office that morning, and requested to be seen earlier. However, her request to reschedule was not accommodated. She thus waited, arriving at Dr. St. John's office at 4:15 p.m., in what Dr. St. John later described as a serious condition. As noted by Dr. St. John at his deposition:

4

She was in moderate to severe preeclampsia. She was in early premature labor. She was markedly uncomfortable. She was short of breath, dizzy. At that point, she had gone into an extreme high-risk state for both she and her babies.

¶13 Upon Bobbie's arrival, Dr. St. John immediately performed an ultrasound in his office, though he did not allow the Petersons to tape or watch the procedure as had been their custom. The results seemed unclear. While Dr. St. John asserted at his deposition that at least one of the twins was alive at the time of the office ultrasound, he also blamed poor equipment and a failure of one of the nurses for the lack of information gleaned from the procedure:

The nurse's efforts to try to get the fetal tracing could have interfered with her care of Bobbie, but she didn't do it long enough to make a difference.

. . . .

The ultrasound machine at the hospital was donated and was not adequate for doing an ultrasound on a lady with twins who was in trouble.

¶14 After completing the ultrasound and evaluating Bobbie's condition, Dr. St. John ordered Bobbie immediately admitted to St. James Hospital. Thereafter, he contacted the Salt Lake City facility to coordinate Bobbie's transfer. Records indicate that the transport team arrived in Butte at 10:10 p.m., after which Bobbie and Ron were transported to Salt Lake City. At the time of their departure, the Petersons believed that both of their babies were still alive.

¶15 After a difficult ride, during which Bobbie lost consciousness at least once, the Petersons, haggard and tired, arrived in Salt Lake City. A post-arrival ultrasound confirmed devastating news: the twin boys who would have been the Petersons' fourth

5

and fifth children, had tragically died. Autopsies revealed death by fetal hypoxia stress. The autopsies further revealed that one twin had died approximately two to three days previous, while the other had died approximately one day earlier. At death, both twins were estimated to be thirty-seven weeks of gestational age.

### *The Malpractice Claim*

¶16   Pursuant to § 27-6-701, MCA, the Petersons filed a malpractice claim before the Montana Medical Legal Panel (MMLP) on April 16, 1999, alleging that Drs. St. John and Jamieson had mismanaged Bobbie's pre-natal care and had caused the death of the twin boys through negligent acts. At the panel proceedings, as well as during subsequent legal proceedings, the doctors were represented by their malpractice carrier, TDC.

¶17   Almost immediately after initiating the representation, TDC hired Dr. Thomas Benedetti (Benedetti), a board-certified Ob-Gyn and perinatologist from the University of Washington Medical Center, to review the case and to opine on the care provided by Drs. St. John and Jamieson. According to a TDC Claim Evaluation Report, Dr. Benedetti "was highly critical of the care rendered by Dr. St. John." In fact, Dr. Benedetti seriously questioned Dr. St. John's lack of antepartum testing and fetal monitoring, his decision to transfer Bobbie to Salt Lake City without confirmation of a living fetus, and his failure to admit Bobbie to the hospital earlier. According to TDC records, Dr. Benedetti noted that "I really feel bad being so critical of somebody practicing in small towns but some of this is just basic stuff."

¶18   The MMLP proceedings concluded on July 22, 1999.

## The Settlement Negotiations

¶19     Shortly after the MMLP rendered its decision, Petersons' attorney, Craig Daue, notified TDC of the Petersons' desire to settle the case.  The notification was by letter dated August 12, 1999.  Thereafter, on August 25, 1999, Daue wrote a second letter to TDC, offering to settle the case for $350,000.  The offer of $350,000 was the first offer made by either side.  Aside from the dollar amount, the letter detailed Daue's theory of the case and estimated the Petersons' personal damages as well as the present value of the twin boys' lifetime earnings.

¶20     TDC attorney John Maynard received Daue's letter of August 25, 1999, on August 27, 1999, and discussed its contents with a TDC claims adjuster.  Thereafter, in an internal memo dated September 29, 1999, the adjuster reviewed the facts of the case, and noted that (1) the Petersons had offered to settle for $350,000, (2) Dr. Benedetti was not supportive of Dr. St. John's care of Bobbie Peterson, and (3) Dr. St. John was interested in settling to protect Dr. Jamieson.  Subsequently, the TDC adjuster prepared a Claim Evaluation Report on October 22, 1999, which noted that:

> Thomas J. Benedetti, M.D., a board-certified OB-GYN and perinatologist practicing at the University of Washington Medical Center in Seattle, WA, reviewed the records in this matter and *was highly critical of the care rendered by Dr. St. John*.

(Emphasis added.)  The adjuster also stated that:

> This is a case that carries some liability exposure, and our best and possibly only defense will be with regards to causation.

Despite identifying Dr. Benedetti's critical opinion and but one viable defense, the report characterized the doctors' liability as "Remote" on TDC's in-house Doctor Risk

7

Assessment Trigger, or "DRAT" code.[1]  The report estimated the Petersons' damages to be $150,000.

¶21    TDC offered to settle with the Petersons for $25,000 on November 11, 1999, the settlement communicated vis-à-vis a letter written by a claims adjuster.  As a basis for the counter-offer, the adjuster stated:

> This offer is, in part, based on our position that Mrs. Peterson substantially contributed to any alleged loss of chance of survival of the fetuses through her decision not to be seen in the emergency department the evening of May 24, 1997. . . .  I do not know how persuasive your client will be when testifying "mother to mother" as to her reasons for choosing not to be seen in the emergency department.

Aside from casting blame on Bobbie Peterson, the letter was also emphatic regarding the final settlement amount, noting that any pre-litigation settlement would not approach the

---

[1]TDC created the DRAT program in 1994 as a means of identifying physicians who were causing a substantial share of TDC's losses.  TDC's claims adjusters were to opine on physician liability, quantifying their opinion with a number ranging from 1 to 7. According to the DRAT Code, "1" stands for "No Liability," "2" stands for "Remote Liability," "3" for "Questionable Liability," "4" for "Undetermined," "5" for "Possible Liability," "6" for "Probable Liability," and "7" for "Liability."

According to a TDC memo concerning the DRAT Code:

In essence, you're making a judgment on a scale of 1 to 7 indicating from lowest to highest what you think is the degree of liability.  Number 4 is the midpoint which would be used in all cases where we have not made any determination.  When in doubt, we should start with using the number 4 for a mid-code.  In order to pick a code above or below the midpoint, a review should have been done.  There may be a case with obvious facts that makes it possible for us to determine in-house, without any outside reviews, that liability does or does not exist.  An example is a case where the physician operated on the wrong body part—we do not need a review to tell us that this would be a likely case of liability.

Petersons' first offer of $350,000—"I can assure you that any amount offered prior to litigation will not reach the six-figure range."

¶22 The Petersons rejected TDC's $25,000 offer, and filed suit in the District Court on January 19, 2000. Thereafter, the parties prepared for statutorily mandated mediation. *See* § 27-6-606(3), MCA. As part of their preparation, TDC arranged for review of the case by a second expert, Dr. Van Kirke Nelson. This expert was also critical of the care provided by Dr. St. John. In a memo written by claims adjuster Barbara Simmons and addressed to TDC counsel John Maynard, Simmons summarized Dr. Nelson's review as follows:

> [H]e feels Dr. St. John's care is inexcusable—The nurses refute St. John's statements that he couldn't get a good visualization of the twins because the ultrasound equipment at the hospital was inferior—St. John could and should have done more—Further, St. John knew but did not tell the parents that their babies were died [sic] but had an obligation to do so. [Dr. Nelson] is unable to support St. John.

Simmons upgraded the DRAT Code from Remote Liability to Liability six days before Dr. Nelson's critical review.

¶23 Although the parties were initially unable to agree on a settlement, the case remained in the mediation process throughout the fall of 2000. The Petersons created a settlement brochure and letter which they sent to TDC on or around November 11, 2000. This package (1) outlined the Petersons' theory of the case, citing admissions and statements from various depositions regarding the doctors' liability, (2) outlined the damages suffered by the Petersons, and (3) responded to potential defenses. Further,

9

based on the information in the brochure, the Petersons withdrew their $350,000 settlement offer, their counsel stating as follows:

> We had expected the proof of causation to be difficult. However, Dr. St. John's testimony that this sad outcome could "absolutely" have been prevented with timely medical attention eliminates any credible causation defense by retained experts.
>
> . . . .
>
> We have always recognized that this case has strong jury appeal. What we feared were technical defenses to the standard of care and causation elements, especially causation. Those concerns are now effectively eliminated through the most effective proof possible, the admissions of the defendants. To the extent that I may have done a disservice to my clients by failing to anticipate how well their case would come together, I will not attempt to hide that mistake by advising that they now accept less than full value for their case. . . . We will be prepared to make the first offer at the mediation.

¶24 Notwithstanding the evidence and arguments set forth in the settlement brochure, the December 15, 2000, mediation did not result in a settlement. The Petersons were unwilling to accept TDC's final offer of $80,000, when they sought in excess of $400,000. Thereafter, Barbara Simmons prepared an updated Claim Evaluation Report on January 8, 2001. The report, vis-à-vis the DRAT Code, indicated Simmons' belief that both doctors were liable. Furthermore, the report indicated that both Simmons and defense counsel estimated that there was an 80 percent chance of a plaintiff verdict if the case went to trial. TDC, however, did not increase its settlement offer, and litigation continued for another year. During that year, Bobbie Peterson attempted suicide and child pornography charges were levied against Dr. Jamieson.

10

¶25    The parties participated in a second mediation on January 17, 2002, approximately two months before trial was set to begin. During this mediation, held about two and one-half years after the Petersons initially requested a settlement, the parties settled for $375,000. As part of the settlement, the Petersons expressly reserved the right to bring a third party MUTPA action against TDC.

### *The MUTPA Action*

¶26    The Petersons filed the present action against TDC on May 20, 2002, wherein they alleged that TDC violated MUTPA by (1) failing to undertake a prompt and thorough investigation, (2) failing to attempt to effectuate a fair settlement after liability became reasonably clear, and (3) failing to conduct themselves in good faith. Specifically, the Petersons alleged that TDC knew or should have known that Drs. St. John and Jamieson were negligent and liable for the death of the Petersons' twin boys, yet refused to settle for a fair amount.

¶27    TDC answered the complaint on August 6, 2002, asserting nine affirmative defenses, including that the Petersons did not want to settle and they and their attorneys had created delays which had hindered settlement, that Petersons' attorneys had not provided necessary damage information, and that TDC had relied on the advice of counsel, precluding liability under the MUTPA.

¶28    At trial, the Petersons gave notice that they intended to admit as evidence their settlement demand letters and brochures to refute TDC's defense that the Petersons did not want to settle and did not give TDC information demonstrating their damages. TDC objected on hearsay grounds. In response, the Petersons asserted that the letters and

11

settlement brochures were admissible under § 26-1-103, MCA, known as the transaction rule. The court, however, rejected this basis for admission of the documents, sustaining TDC's objection. As a result, during the trial, defense witnesses and counsel made statements suggesting that the Petersons did not want or try to settle and further, argued to the jury that the Petersons did not give specific information regarding certain damages. For instance, TDC's Vice President of Claims testified that:

> Yes, I mean, I think if the plaintiff's attorney wants to settle a case, they have the burden of proof to prove to us that they've got the damages, and it's their obligation to provide us with the information, and the only information we can get pre-litigation . . . would be from them.

In its closing argument, TDC argued that:

> The Plaintiffs wouldn't negotiate. [TDC] offered eighty thousand dollars. The Plaintiffs walked out of the mediation.

> Barbara Simmons called up, and said she wanted to negotiate. She gave them an open door. They wouldn't negotiate.

> Plaintiffs had a different agenda. They were not—obviously, not interested in settlement.

¶29 The District Court also ruled that the Petersons' attorneys' files from the underlying malpractice action were after-acquired evidence and not discoverable, and excluded evidence regarding the past relationship between counsel for the Petersons and counsel for TDC. Finally, the court admitted a minor death verdicts chart offered by TDC to illustrate its use of this verdict information in the process of negotiating the claim.

¶30 The jury returned a verdict in favor of TDC, indicating on the special verdict form that TDC did not violate the MUTPA because it did not "(A) misrepresent pertinent facts

12

relating to coverages at issue; (B) [r]efuse to pay the Petersons' claim without conducting a reasonable investigation based upon all available information; [and] (C) [n]eglect to attempt in good faith to make prompt, fair, and equitable settlements of the Petersons' claim if liability had become reasonably clear." The Petersons appeal, and TDC cross-appeals, from the District Court's evidentiary rulings.

## STANDARD OF REVIEW

¶31    "A district court has broad discretion in determining whether evidence is relevant and admissible . . . ." *Glacier Tennis Club v. Treweek Construction Co.*, 2004 MT 70, ¶ 47, 320 Mont. 351, ¶ 47, 87 P.3d 431, ¶ 47. Accordingly, we review a district court's evidentiary rulings for abuse of discretion. *Glacier Tennis Club*, ¶ 47; *see also Payne v. Knutson*, 2004 MT 271, ¶ 20, 323 Mont. 165, ¶ 20, 99 P.3d 200, ¶ 20. "A district court abuses its discretion when it acts arbitrarily without employment of conscientious judgment or exceeds the bounds of reason, resulting in substantial injustice." *State v. Riggs*, 2005 MT 124, ¶ 18, 327 Mont. 196, ¶ 18, 113 P.3d 281, ¶ 18; *see also Citizen Advocates For a Livable Missoula v. City Council*, 2006 MT 47, ¶ 18, 331 Mont. 269, ¶ 18, 130 P.3d 1259, ¶ 18.

## DISCUSSION

*1.  Did the District Court err in excluding as hearsay letters and correspondence written by counsel for the Petersons and received by The Doctors' Company during settlement negotiations of the Petersons' malpractice claims?*

¶32    The Petersons claimed that TDC violated § 33-18-201, MCA, by (1) not considering all available information before attempting settlement, and (2) not effecting a good faith settlement after liability became reasonably clear. In pursuit of those claims,

13

the Petersons offered the settlement letters and brochures dated August 12, 1999, August 26, 1999, and November 11, 2000, to show that TDC knew that the Petersons had wanted to settle their claim, that TDC possessed the Petersons' detailed settlement demands and theory of the case, from at least November 11, 2000, and that liability was reasonably clear long before the final settlement. The District Court, however, sustained TDC's hearsay objection to this evidence, rejecting the Petersons' argument that the letters and brochures were admissible under § 26-1-103, MCA. We conclude that the District Court abused its discretion in not admitting these letters.

¶33 Included within Petersons' suit was the assertion that TDC had violated § 33-18-201(4), MCA, which prohibits a refusal to pay claims without conducting a "reasonable investigation *based upon all available information,*" and § 33-18-201(6), MCA, which prohibits neglecting to attempt in good faith to effectuate a prompt, fair and equitable settlement of a claim "*in which liability has become reasonably clear.*" Both of these claims thus test the propriety of the actions taken or not taken by the insurer in light of the information possessed by the insurer at the time it adjusted the underlying claim.

¶34 The Petersons' letters and brochure, offered to establish that TDC possessed these documents when it adjusted the Petersons' claim, were not, within this MUTPA trial, "testimonial" evidence subject to a hearsay objection in the absence of the author. Within a MUTPA trial, these documents intrinsically speak for themselves, and thus, upon a foundation that the documents were, in fact, within TDC's possession when adjusting the Petersons' claim, an issue apparently not contested here, the documents were admissible. Of course, the parties are free to dispute the truthfulness of the

14

statements made within the documents or the significance of the documents—TDC would be free to attempt to dismiss them as inaccurate, inadequate or inconsequential—but it cannot block, on hearsay grounds, the admission of documents it held when adjusting the underlying claim. The failure to admit the documents was an abuse of discretion.

¶35 Having concluded that the documents were admissible in a MUTPA trial and that TDC's hearsay objection was ineffectual, we need not take up Petersons' argument that the documents were admissible pursuant to the transaction rule. Further, we conclude that this error, which prevented the Petersons from establishing the full extent of the information possessed by TDC at the time it adjusted their claim, and from answering defenses raised by TDC, was prejudicial to the Petersons, requiring reversal and a remand for a new trial.

## 2. Did the District Court err in admitting a minor death verdicts chart?

¶36 On numerous occasions during the MUTPA trial, TDC made reference to and presented to the jury Exhibit J-2, a chart summarizing child death verdicts in Montana and referred to by the parties as the "Montana Law Week Minor Death Verdicts Chart" (Verdicts Chart). One of TDC's primary arguments within the trial was that Montana juries have not generally ruled in favor of plaintiffs who seek damages for the death of their children, and that this information was of consequence to TDC's settlement posture. That information was illustrated on the Verdicts Chart. Over the objection of Petersons, the District Court admitted the chart as a demonstrative exhibit, but excluded evidence about the underlying cases from which the verdict information was drawn. On appeal,

the Petersons argue that the Verdicts Chart is irrelevant, prejudicial, and inadmissible hearsay. TDC counters that the information presented in the exhibit represents an important tool utilized by both adjusters and lawyers in settlement negotiations, and therefore, argues that the chart was highly relevant evidence for a MUTPA trial.

¶37 TDC presented the Verdicts Chart to assist juror understanding of the malpractice settlement procedures and values it utilized in adjusting the Petersons' claim. TDC used the past minor death verdicts and awards in calculating its settlement offers; indeed, the more defense verdicts it uncovered, the more unwilling it was to settle for the Petersons' desired price. Accordingly, it was relevant as a demonstration of the information used by TDC when adjusting Petersons' claim, which could tend to prove that TDC negotiated with the Petersons in good faith.

¶38 Relevant evidence is generally admissible. *State v. Vandersloot*, 2003 MT 179, ¶ 16, 316 Mont. 405, ¶ 16, 73 P.3d 174, ¶ 16; *see also* M. R. Evid. 402. However, the Petersons argue that the Verdicts Chart, if relevant, was nevertheless so prejudicial as to make it inadmissible. M. R. Evid. 403 provides:

> Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

¶39 Evidence was offered at the trial to demonstrate that knowledge of past verdicts and settlements is critical to an insurer when evaluating malpractice claims, and that such information provides a basis on which to generate settlement offers and counter-offers. The information contained in the Verdicts Chart simply reflected what past juries have

16

decided in child death cases. While potentially helpful to TDC and thus prejudicial to Petersons' claims, it was a truthful representation of the information used in the process at issue, and we cannot conclude that either the information or the manner it was presented within the Verdicts Chart was so prejudicial as to substantially outweigh the exhibit's probative value. Ultimately, this MUTPA action was not about the amount of the settlement which TDC paid to the Petersons, but, rather, about the process used by TDC before entering the settlement. The District Court limited somewhat the use of the verdict information and gave the Petersons ample opportunity to cross-examine witnesses and challenge the exhibit on its veracity and the comparability of its contents to the present case. We conclude that the admission of the chart was not an abuse of discretion by the District Court.

### 3. Did the District Court err in refusing to allow discovery of the Petersons' attorneys' files?

¶40    TDC moved to compel production of Petersons' attorneys' files from the underlying malpractice case against the doctors. The District Court struggled with the motion, originally granting the request, but ultimately, upon Petersons' request for rehearing, denying the motion. In the end, the court found the information contained in the Petersons' attorneys' files irrelevant to the question of whether TDC negotiated in good faith pursuant to MUTPA.

¶41    In its cross-appeal, as it did in the District Court, TDC argues that much of the information contained in the Petersons' attorneys' files was highly relevant to its defense of the MUTPA action. Specifically, TDC argues that information about how the

17

Petersons' valued their own case is relevant to whether TDC complied with MUTPA, and that the Petersons' file may contain information regarding Petersons' delay or an unwillingness to settle. The Petersons argue that their attorneys' files are irrelevant to the question of whether TDC negotiated in good faith, since that question is based on what TDC knew at the time it adjusted the claim.

¶42 M. R. Civ. P. 26(b)(1) provides:

> Parties may obtain discovery regarding any matter, not privileged, which is relevant to the subject matter involved in the pending action, whether it relates to the claim or defense of the party seeking discovery or to the claim or defense of any other party. . . . It is not ground for objection that the information sought will be inadmissible at the trial if the information sought appears reasonably calculated to lead to the discovery of admissible evidence.

Thus, when deciding whether to allow discovery, the question is whether the sought-after files could reasonably lead to discovery of admissible evidence. Here, the District Court ruled that the Petersons' attorneys' files from the underlying action were irrelevant in the pending MUTPA matter and were therefore undiscoverable.

¶43 The essence of a claim under § 33-18-201, MCA, is that an insurer, given information available to it, has acted unreasonably in adjusting a claim, perhaps by failing to investigate, failing to communicate or failing to negotiate in good faith. Section 33-18-201, MCA, seeks to protect parties from such acts, and the relevant issue is almost universally *how the insurer acted* given the information available to it. *See EOTT Energy Operating Ltd. Partnership v. Certain Underwriters at Lloyd's of London*, 59 F.Supp.2d 1072, 1075-76 (D. Mont. 1999); *Twin City Fire Ins. Co. v. Burke*, 63 P.3d 282, 286-87 (Ariz. 2003). In most cases, the conduct of the claimant or how the claimant evaluated its

18

own case is simply irrelevant. In a MUTPA case, the claimant's attorney's file from the underlying claim is generally undiscoverable under M. R. Civ. P. 26(b).

¶44    Despite this general rule, however, this Court has previously noted that a claimant's conduct in the underlying matter can be relevant for purposes of a later MUTPA case, if the claimant acts in such a way which delays or impairs the ability of the insurer to settle. *See Spadaro v. Midland Claims, Inc.*, 227 Mont. 445, 450-51, 740 P.2d 1105, 1108-09 (1987); *Juedeman v. National Farmers Union Prop.*, 253 Mont. 278, 281-82, 833 P.2d 191, 193 (1992), *overruled on other grounds, Shilhanek v. D-2 Trucking*, 2003 MT 122, ¶ 32, 315 Mont. 519, ¶ 32, 70 P.3d 721, ¶ 32. Where such actions by the claimant are proven, the insurer may defeat the claimant's claims under § 33-18-201, MCA. *Spadaro*, 227 Mont. at 450-51, 740 P.2d at 1108-09; *Juedeman*, 253 Mont. at 282, 833 P.2d at 193. Accordingly, we cannot conclude that an attorney's file from an underlying case is *per se* undiscoverable in a subsequent MUTPA case. Depending upon the claims asserted by the plaintiff, the attorney's file may contain information reasonably calculated to lead to discoverable evidence about actions of a claimant supporting an insurer's defense. Such discovery requests by an insurer, however, cannot be "fishing expeditions." The requests must be narrowly tailored to lead to discoverable information, and the district courts may well need to prohibit discovery requests which are too broad, given the particular claims and defenses of each case.[2]

_____

[2]Of course, such discovery requests must also comply with the law which protects attorney work product. An attorney's ordinary work product may be discovered upon a showing that it is relevant and not privileged. M. R. Civ. P. 26(b)(1). An attorney's opinion work product may be discovered only upon a showing that the attorney's mental

19

¶45    Here, Petersons claimed that TDC had failed to act promptly, failed to effectuate a fair settlement and failed to act in good faith. TDC defended by asserting that the Petersons did not want to settle and had failed to provide information on damages in the underlying case, thus delaying and impairing TDC's ability to settle. As such, TDC argues it was entitled the opportunity to discover such information from the Petersons' attorneys' files which would support its defenses to the claims the Petersons had raised.

¶46    The District Court ruled that Petersons' attorneys' files were *per se* irrelevant and undiscoverable, which we conclude was an overbroad basis on which to deny the request, in light of our foregoing discussion. However, we further conclude that TDC's discovery requests were not narrowly tailored to lead to discoverable information. Rather, TDC sought

> all of the files, records and documents of any sort, including time, expense, and billings [sic] records maintained by your attorney Craig Daue, his law firm, partners and associates relating to your representation in connection with your underlying claims against Robert St. John and Andrew Jamieson, together with the files of all investigators, consultants or experts retained by your attorneys relating to those claims.

TDC also requested "all of [Petersons'] files, records and documents of any sort relating to or referring to the occurrence in question, the injuries and damages allegedly flowing

---

impressions are "*directly at issue* in the case and the need for the material is compelling." *Palmer by Diacon v. Farmers Ins. Exchange*, 261 Mont. 91, 117, 861 P.2d 895, 911 (1993). "To meet the 'compelling need' requirement, the party seeking discovery must demonstrate that weighty considerations of public policy and the administration of justice outweigh the need to protect the mental impressions of the opposing party's attorneys or its representatives." *Palmer by Diacon*, 261 Mont. at 117, 861 P.2d at 911. *See also Prindel v. Ravalli County*, 2006 MT 62, ¶ 63, 331 Mont. 338, ¶ 63, 133 P.3d 165, ¶ 63. The District Court cited "attorney-client and/or work product protections" as a reason for denial of the discovery request.

from the occurrence, or to your claims against Defendant." Clearly, TDC's requests were not limited in scope and tailored to its defenses to Petersons' claims, such as a request for those documents created during the period of settlement negotiations it believed Petersons had engaged in delay tactics. The information sought was far broader than that necessary to discover information regarding Petersons' alleged delay and impairment of TDC's ability to settle.

¶47    The District Court had broad discretion with regard to discovery matters in this case. We cannot say that it abused its discretion by denying TDC's overly broad requests for *all* of Petersons' and their attorneys' files in the underlying action. Accordingly, we affirm.

**4. Did the District Court err in excluding all evidence of the previous relationship between Petersons' attorneys and The Doctors' Company?**

¶48    In support of its defenses, TDC sought to introduce evidence of Petersons' attorneys' relationship and role, in recent past, with TDC. Petersons' attorneys had previously been employed by TDC and represented the insurer in medical malpractice litigation. In answer to Petersons' claim that its settlement offers to the Petersons were unfair and "lowball," TDC sought to introduce recommendations made by Petersons' counsel in similar cases when they were employed by TDC. Further, in support of TDC's assertion that Petersons and their attorneys were responsible for the delay in settlement, TDC sought to introduce evidence that Daue's recent departure from TDC had left TDC's other counsel in a time bind. Finally, TDC sought to demonstrate that its

21

relationship with Petersons' attorneys affected the manner in which they negotiated on Petersons' claims.

¶49 The District Court concluded that this evidence was both irrelevant and highly prejudicial, and prohibited TDC from introducing evidence of these past relationships, reasoning that:

> Mention of Craig Daue's or Douglas Buxbaum's prior representations and communications with other Insureds are irrelevant and further it is highly prejudicial to the Plaintiffs, Bobbie and Ron Peterson. Mr. Bob Phillips is being called as an expert for the Defendants in this case to cover what the defense intends to bring out in this request. It has the appearance of being an attack on the credibility of Mr. Daue and the Court will not allow it.

¶50 Although we agree with TDC that some of the evidence about these past relationships may have been relevant to the extent that it may have explained how TDC formulated its negotiation strategy and why TDC acted in certain ways, we agree with the District Court that any probative value of this evidence was substantially outweighed by the danger of unfair prejudice to the Petersons. Further, the District Court afforded TDC a limited opportunity to explain how knowing Petersons' counsel affected TDC's settlement strategy. As stated by the court:

> Mr. Maynard [counsel for TDC] can explain his friendship with Mr. Daue [counsel for the Petersons] and his knowledge of Mr. Daue in forming his strategy of "step offers." However, there will be no mention of prior representation of Mr. Daue or his firm [at] The Doctors' Company.

Given that opportunity and the significant potential for prejudice, we conclude that the District Court did not abuse its discretion in substantially precluding the introduction of this evidence in the trial, and this cross-appeal issue is affirmed.

22

## CONCLUSION

¶51    Issues two, three and four are affirmed.  On the basis of our resolution of Issue one, this matter is reversed and remanded for proceedings consistent with this opinion.

/S/ JIM RICE

We concur:

/S/ KARLA M. GRAY
/S/ W. WILLIAM LEAPHART
/S/ JAMES C. NELSON
/S/ PATRICIA COTTER
/S/ BRIAN MORRIS

Justice John Warner dissents.

¶52    I respectfully dissent.  The case was fairly tried in the District Court and the judgment should be affirmed.  The District Court's evidentiary rulings were well considered and well within its discretion.

¶53    The underlying medical negligence case is not nearly as simple as the Court describes it.  Petersons' claims arose out of a later-in-life pregnancy involving a constellation of dangerous complications.  The result, the death of the twins Mrs. Peterson was carrying, was sad, even tragic.  However, notwithstanding the Court's one-sided statement of the facts, the record shows that TDC has a viable argument that the underlying claims might have been successfully defended.

23

¶54    As noted by the Court at ¶ 32, the Petersons offered into evidence in this MUTPA action demand letters and a settlement brochure prepared by their counsel and sent to counsel for TDC.  The Court states that the relevance of these documents was to prove that plaintiffs did indeed want to settle, that TDC possessed plaintiffs' theory of the case, that plaintiffs made a demand for money, and that liability was reasonably clear.

¶55    There was no contest during the trial that the Petersons made offers to settle, and that they made a demand for money damages.  The facts concerning offers that were made, when, and for what amounts, were in evidence.  The jury duly considered the course of the settlement negotiations in the underlying case.

¶56    Petersons suffered no unfair prejudice by the exclusion of these documents.  There was no contest that they were received.  The testimony of the TDC vice-president of claims, quoted by the Court at ¶ 28, is taken out of context.  His testimony was to the effect that he could not recall that TDC received plaintiffs' medical bills, and it was plaintiffs' obligation to provide this information.  The letters and settlement brochure were not necessary to prove whether TDC received plaintiffs' medical bills.

¶57    The closing argument of TDC's counsel, quoted by the Court at ¶ 28, was a comment on the evidence in the case.  That argument acknowledged that offers to settle were made, and rejected, by both sides.  And, because the evidence included the particulars of each offer, there was nothing of substance hidden from the jury by the District Court's order excluding the letters written by plaintiffs' counsel and the settlement brochure, which naturally tout Petersons' version of the underlying case.

24

¶58    The letters and brochure this Court now orders into evidence are testimonial evidence. They were indeed received by TDC, but they most certainly do not intrinsically speak for themselves—they speak for Petersons and their lawyer. They are, understandably, rife with hyperbole advanced in support of Petersons' cause. The real purpose of offering these documents into evidence, which the District Court recognized and this Court misses entirely, was to allow Petersons' counsel to testify as to his opinion that the underlying case was a sure winner, and that the damage award would be large. The effect of admitting them into evidence is to allow a plaintiff's lawyer to testify as an expert, without subjecting himself to cross-examination. And, of course, the very reason for the hearsay rule is to exclude evidence that is not subject to cross-examination. *State v. Mizenko*, 2006 MT 11, ¶ 170, 330 Mont. 299, ¶ 170, 127 P.3d 458, ¶ 170; *see Bean v. Montana Bd. of Labor Appeals*, 1998 MT 222, ¶ 34, 290 Mont. 496, ¶ 34, 965 P.2d 256, ¶ 34.

¶59    The question tried to the jury was whether TDC acted in bad faith in its dealings with Petersons as defined by MUPTA. The letters from their counsel and the settlement brochure are only tangentially related to this question. However, as this mostly irrelevant and cumulative evidence is now ordered to be admitted into evidence on re-trial, TDC must be allowed to include in its defense its in-house evaluation of plaintiffs' counsel, as recognized by the Court at ¶ 50. TDC is entitled to defend its decision in the underlying case that liability was not reasonably clear. Since Petersons' lawyer's opinion on this issue will be admitted into evidence on re-trial, TDC must be allowed to present evidence

25

on why it questioned this opinion. TDC's past relationship with Petersons' counsel has now become highly relevant.

¶60 The demand letters contain numerous statements of fact that are disputable. Both the demand letters and the settlement brochure are literally filled with the opinions of Petersons' counsel. If their lawyer is to be allowed to testify as to facts and to give his opinion as an expert, via documents he prepared, his files must now be discoverable to examine the basis of such opinions, as well as to find out if the information contained in these files leads to admissible evidence which could aid the defense. This is not only required by M. R. Evid. 705, it is necessary if TDC is to be "free to dispute the truthfulness of the statements made within the documents" and "free to attempt to dismiss them as inaccurate, inadequate or inconsequential" as stated by the Court at ¶ 34. And, TDC might wish to call Petersons' lawyer as a witness concerning the purpose, content, and veracity of the demand letters and settlement brochure. This could easily raise problems with present counsel's continuing representation under Rule of Professional Conduct 3.7, which prohibits a lawyer from acting as an advocate at a trial in which he is likely to be a necessary witness, except under certain circumstances.

¶61 As noted by the Court at ¶ 31, a district court has broad discretion to determine the admissibility of evidence, and this Court reviews a district court's evidentiary rulings for an abuse of discretion. To reverse a district court's evidentiary ruling for abuse of discretion, this Court must determine that the district court either "'act[ed] arbitrarily without employment of conscientious judgment or exceed[ed] the bounds of reason[,] resulting in substantial injustice.'" *Riggs*, ¶ 18; *Kiely Constr., L.L.C. v. City of Red*

26

*Lodge*, 2002 MT 241, ¶ 92, 312 Mont. 52, ¶ 92, 57 P.3d 836, ¶ 92 (quoting *Jarvenpaa v. Glacier Elec. Co-op., Inc.*, 1998 MT 306, ¶ 13, 292 Mont. 118, ¶ 13, 970 P.2d 84, ¶ 13). The letters and settlement brochure are literally full of hearsay and properly excluded under M. R. Evid. 802.

¶62 The experienced trial judge not only recognized the true purpose of the letters and settlement brochure, his ruling excluding them caused no prejudice to plaintiffs as no material facts were kept from the jury. It was the exclusion of the letters and settlement brochure which made discovery and introduction into evidence of Petersons' counsel's file unnecessary. As they will be admitted into evidence on re-trial, all of the underlying facts or data which forms the basis of these opinions become relevant and also discoverable. M. R. Evid. 705.

¶63 In my view, the evidentiary rulings of the trial judge were made in the exercise of sound judgment and they did not exceed the bounds of reason resulting in substantial injustice. I would affirm the judgment and dissent from the Court's decision to remand this case for another trial.

/S/ JOHN WARNER