DA 10-0413

IN THE SUPREME COURT OF THE STATE OF MONTANA

2011 MT 223

HEATHER L. WEBER,

       Plaintiff and Appellant,

  v.

BNSF RAILWAY COMPANY,
a Delaware corporation,

       Defendant and Appellee.

APPEAL FROM:    District Court of the Thirteenth Judicial District,
In and For the County of Yellowstone, Cause No. DV 07-0947
Honorable G. Todd Baugh, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

          Jason L. Harkins; Harkins Law Firm, PC, Billings, Montana

      For Appellee:

          Jeff Hedger, Michelle T. Friend, Ronald E. Youde; Hedger Friend
P.L.L.C., Billings, Montana

                     Submitted on Briefs:  July 13, 2011

                            Decided:  September 13, 2011

Filed:

_____
Clerk

Justice Beth Baker delivered the Opinion of the Court.

¶1     Plaintiff Heather L. Weber ("Weber") appeals from the Thirteenth Judicial District Court's judgment for defendant BNSF Railway Company ("BNSF") after a jury found no negligence by the railroad in Weber's Federal Employers' Liability Act ("FELA") claim. 49 U.S.C. §§ 51-60.  Weber argues the District Court erred in dismissing her claim under the Locomotive Inspection Act ("LIA"), 49 U.S.C. §§ 20701-20703, and in granting BNSF's motion to exclude portions of expert testimony pertaining to the results of a positron emission tomography ("PET") scan performed on Weber.  We reverse the District Court in part and remand for further proceedings.

¶2     We consider the following issues on appeal:

¶3     *1. Whether the District Court erred in granting BNSF's motion for judgment as a matter of law on Weber's LIA claim.*

¶4     *2. Whether the District Court erred in granting BNSF's motion to exclude testimony from Weber's treating physician about the results of the PET scan.*

### FACTUAL AND PROCEDURAL BACKGROUND

¶5     Weber worked as a locomotive engineer for BNSF.  In the early morning hours of February 4, 2007, Weber and Chad Ferguson, a conductor, were working on a two-person train crew taking a loaded coal train from Gillette to Guernsey, Wyoming.  The train, 6,930 feet in length, was powered by two locomotives in the front of the train together with two locomotives at the rear, referred to as distributed power ("DP").  The engineer in the lead locomotive controls the DP and operates the DP in tandem with the front

2

locomotives. The DP can be disabled, or "isolated" by the engineer, meaning the DP provides no power.

¶6     The tracks leading into Guernsey go through several tunnels, including one known as Tunnel 3. Prior to entering Tunnel 3, a sign alerts engineers to isolate the DP. The DP must be isolated because the front and back ends cannot communicate once the train enters the tunnel.

¶7     As Weber approached the tunnel around 3:00 a.m., she realized she had not yet isolated the DP. Weber stopped the train to isolate the DP. Weber described that she "stopped sloppy," causing bunching and stretching between the railcars, because she did not wait the appropriate amount of time when changing throttle positions to slow the train gradually. Weber stopped the train in this manner because she was unfamiliar with the location and unsure how long it would take for the train to stop. The train came to a stop approximately ten to fifteen railcars from the entrance of the tunnel on a section of single track, blocking all rail traffic going in and out of Guernsey.

¶8     After isolating the DP, Weber attempted several times to move the train forward. The train had moved slightly when a knuckle, a coupling mechanism connecting railcars, broke. When the knuckle broke, the train stopped and went into "emergency." A default code also appeared on the computer screen of the locomotive. As part of his duties as conductor, Ferguson attempted to fix the broken knuckle but lacked the required tools. Ferguson called for mechanical assistance and ultimately replaced the knuckle when assistance arrived several hours later. However, the default code remained on the screen. To remove the code from the screen, the engineer must determine what the code is

3

referencing and correct the problem. Despite phone calls to BNSF operators, Weber could not determine the origin of the default code and was unable to move the train. Ultimately, Houston P. Cullison, a trainmaster and supervisor, was called and sent a diesel maintenance crew to investigate the problem. Cullison also went to the site of the train, arriving shortly after 8:00 a.m.

¶9    Cullison did not see the computer screen but was told by Weber that the default code read "BLD." Although Weber later learned BLD referred to the application of brakes to the DP, no one on site that day knew what the code meant. The maintenance team performed a "field load test" on the front locomotives which showed they were producing power. Weber then attempted to put the train in motion by placing the throttle in multiple positions, but it would not move. Cullison directed Weber to connect with the DP to provide power to move the train. Weber complied with Cullison's instructions and the train began proceeding forward. Cullison then instructed Weber to isolate the DP since the train was moving into the tunnel. Once the DP was isolated, the train began to lose power and came to a stop in the tunnel. Cullison directed Weber to stay in the cab so she could back out of the tunnel while Cullison and Ferguson went to the rear to protect the backward shove of the mile-long train. The two front locomotives continued to run while Weber waited in the locomotive cab inside the tunnel. Witness testimony conflicted as to how long Weber remained in the tunnel, ranging from ten to forty minutes. Upon reaching the rear of the train, Cullison radioed Weber to back up the train. Weber then reactivated the DP and reversed the train out of the tunnel, providing sufficient room so two additional engines could be attached to the front of the train

4

outside the tunnel. Another crew was called to the site with the two replacement engines to attach to the front of the train and move it through the tunnel.

¶10 Since Weber and Ferguson had reached the end of their shift, they were transported by van to a motel facility provided by BNSF. The next day, Weber and Ferguson were assigned to another train headed for Gillette, Wyoming. Weber complained of feeling nauseous and attempted to sleep while the train was waiting to move. Weber testified that over the coming weeks and months she experienced a number of symptoms including nausea, headaches, fatigue, disorientation, tremors, forgetfulness and difficulty focusing her eyes.

¶11 On July 31, 2007, Weber filed suit under FELA to recover for personal injuries allegedly suffered on February 4, 2007, during the course and scope of her employment with BNSF. Weber's Complaint alleged four counts. The first count alleged that BNSF breached its duty under FELA. The second count was based on BNSF's alleged violation of the LIA. Counts Three and Four alleged BNSF's violation of the Safety Appliance Act ("SAA"), 49 U.S.C. §§ 20301-20306, federal regulations and other standards.

¶12 In March 2008, Weber attended her first appointment with Dr. Hugh Batty. Based on Weber's history, Dr. Batty formed a working diagnosis that Weber had suffered carbon monoxide poisoning when her train stalled in Tunnel 3. Dr. Batty provided Dr. Daniel Alzheimer, a neurologist, with Weber's history, indicating she had been exposed to carbon monoxide. At Dr. Batty's request, Dr. Alzheimer performed a PET scan of Weber on August 14, 2008. Dr. Alzheimer interpreted the PET scan and found it "consistent with [carbon monoxide] exposure with no corroborative findings on the CT

5

scan as discussed." Dr. Batty then diagnosed Weber as having permanent brain damage secondary to carbon monoxide exposure, as a result of being confined in the tunnel with the running locomotives.

¶13 Prior to trial, BNSF filed a motion in limine to exclude the PET scan evidence on the grounds that Dr. Alzheimer had not been disclosed as an expert witness, Plaintiff's expert disclosures did not show reliance on the PET scan by any properly disclosed expert, and M. R. Evid. 703 did not permit the PET scan to be "bootstrapped" in by Dr. Batty, despite his claim to having relied on it in formulating his diagnosis. Weber designated Dr. Alzheimer as a potential witness on February 17, 2010. The District Court denied BNSF's motion on March 12, 2010, indicating Weber could introduce proper foundational testimony through Dr. Alzheimer should she desire to have Dr. Batty testify to the results of the PET scan. BNSF renewed its motion in limine when it learned Dr. Alzheimer would not testify at trial. After hearing considerable argument from both sides, the District Court granted BNSF's motion to exclude the results of the PET scan.

¶14 At the end of Weber's case-in-chief, BNSF moved the court, pursuant to M. R. Civ. P. 50(a), to dismiss Weber's LIA and SAA claims. The court commented:

> I don't know that the Locomotive Inspection Act or the Safety Appliance Act has a lot to do with this case. There hasn't been any expert testimony on those things, but they are part of the overall picture. I don't know whether it's a condition as opposed to a cause. I -- it wouldn't certainly be the direct cause of the -- or the proximate cause, as we say in Montana, about the injury, but nonetheless, the motion for directed verdict . . . is denied.

BNSF renewed its motion regarding the LIA and SAA claims at the end of its case-in-chief. The District Court's exact ruling is unclear. The court stated, "I can handle the

6

SSA [sic] real easy, that's all that contributed to was an elongated stop, didn't have to do with the tunnel. That's the way I look at it." The court denied both parties' motions for directed verdict. The court refused, however, to use Weber's proposed special verdict form which, though not part of the record on appeal, apparently contained questions pertaining to the LIA and SAA. The court also refused Weber's proffered jury instructions on the LIA and SAA. The jury was thus not presented with Weber's claim that BNSF violated the LIA or SAA.

¶15 The jury returned its verdict on May 7, 2010, and found BNSF not negligent. Following entry of judgment, the District Court denied Weber's motion for a new trial and Weber timely appealed to this Court. On appeal, Weber challenges the District Court's apparent grant of BNSF's motion to dismiss her LIA claim and refusal of her proposed jury instructions regarding the LIA. Weber also challenges the court's refusal to allow the PET scan results to be introduced through Dr. Batty.

## STANDARD OF REVIEW

¶16 We review *de novo* a district court's grant of a motion for judgment as a matter of law. *Johnson v. Costco Wholesale*, 2007 MT 43, ¶ 18, 336 Mont. 105, 152 P.3d 727. We apply the same standards as the district court:

> Judgment as a matter of law is properly granted only when there is a complete absence of any evidence which would justify submitting an issue to a jury and all such evidence and any legitimate inferences that might be drawn from the evidence must be considered in the light most favorable to the party opposing the motion.

*Johnson*, ¶ 13 (citations omitted).

7

¶17 When exercising jurisdiction over a claim brought under a federal statute, we apply federal substantive law. *See Audit Servs., Inc. v. Harvey Bros. Constr.*, 204 Mont. 484, 487, 665 P.2d 792, 794 (1983).

¶18 We review a district court's rulings on the admissibility of expert testimony for abuse of discretion. *DiMarzio v. Crazy Mt. Constr. Inc.*, 2010 MT 231, ¶ 19, 358 Mont. 119, 243 P.3d 718 (citing *Sunburst Sch. Dist. No. 2 v. Texaco, Inc.*, 2007 MT 183, ¶ 68, 338 Mont. 259, 165 P.3d 1079). A district court has broad discretion in determining whether evidence is relevant and admissible. *Peterson v. Drs.' Co.*, 2007 MT 264, ¶ 31, 339 Mont. 354, 170 P.3d 459.

## DISCUSSION

¶19 ***1. Whether the District Court erred in granting BNSF's motion for judgment as a matter of law on Weber's LIA claim.***

¶20 "FELA renders railroads liable for employees' injuries or deaths 'resulting in whole or in part from [carrier] negligence.'" *CSX Transp., Inc. v. McBride*, ___ U.S. ___, 131 S. Ct. 2630, 2634 (2011) (quoting 45 U.S.C. § 51). Coupled with FELA are numerous safety statutes including the LIA and its predecessor, the Boiler Inspection Act, and the Safety Appliance Act. *Urie v. Thompson*, 337 U.S. 163, 189-90, 69 S. Ct. 1018, 1303 (1949). The safety statutes do not contain a separate cause of action, but "supplement[] the Federal Employers' Liability Act by imposing on interstate railroads 'an absolute and continuing duty' to provide safe equipment." *Urie,* 337 U.S. at 188, 69 S. Ct. at 1034. Thus, injured railroad employees may sue for statutory violations under FELA. *Dallas v. Burlington N.*, 212 Mont. 514, 520, 689 P.2d 273, 276 (1984).

8

¶21 The LIA imposes an absolute duty on railroads to provide its employees with properly working equipment and devices to prevent "unnecessary peril to life or limb." *Plouffe v. Burlington N.*, 224 Mont. 467, 474, 730 P.2d 1148, 1153 (1987); *Lilly v. Grand Trunk W. R.R. Co.*, 317 U.S. 481, 485, 63 S. Ct. 347, 351 (1943). The LIA provides in part that:

> A railroad carrier may use or allow to be used a locomotive or tender on its railroad line only when the locomotive or tender and its parts and appurtenances—
> (1) are in proper condition and safe to operate without unnecessary danger of personal injury.

49 U.S.C. § 20701. The LIA should be "liberally construed" in light of its primary purpose to protect employees and require the use of safe equipment. *Lilly*, 317 U.S. at 486, 63 S. Ct. at 351.

¶22 To prevail on her LIA claim, Weber must demonstrate both that the LIA has been violated and that the violation caused her injuries. *Grogg v. Missouri P.R. Co.*, 841 F.2d 210, 212 (8th Cir. 1988). The plaintiff's burden of proof differs in a FELA case when the claim is premised on a violation of the LIA. FELA requires a showing of negligence, whereas the LIA requires proof of a statutory violation. *Dallas*, 212 Mont. at 520, 689 P.2d at 276. When a plaintiff alleges that a railroad has violated a federal safety statute, the Supreme Court has "extended the reach of the principle of negligence *per se* to cover injuries suffered by employees as a result of their employers' statutory violations, even if the injuries sustained were not of a type that the relevant statute sought to prevent." *Consol. Rail Corp. v. Gottshall*, 512 U.S. 532, 543, 114 S. Ct. 2396, 2404 (1994). If the employee establishes a violation of the LIA, the negligence requirement of a FELA claim

9

is thus established as a matter of law. *Carter v. Atlanta & St. Andrews Bay Ry. Co.*, 338 U.S. 430, 434-35, 70 S. Ct. 226, 229 (1949).

¶23 To establish a violation of the LIA, the plaintiff must show that the locomotive or its parts and appurtenances failed to "perform properly in an intended service for which it was being used." *S. Ry. Co. v. Bryan*, 375 F.2d 155, 158 (5th Cir. 1967) (citing *O'Donnell v. Elgin, J. & E. Ry. Co.*, 338 U.S. 384, 394, 70 S. Ct. 200, 206 (1949)). The plaintiff need not offer evidence of a specific locomotive defect. *S. Ry. Co.*, 375 F.2d at 158; *Grogg*, 841 F.2d at 212. A finding of a violation will be sustained if there is "proof that the mechanism failed to work efficiently and properly. The test in fact is the performance of the appliance." *Grogg*, 841 F.2d at 212 (quoting *Myers v. Reading Co.*, 331 U.S. 477, 483, 67 S. Ct. 1334, 1338 (1947)). Even without evidence of a precise mechanical defect, if the testimony indicates the part or appurtenance failed to "produc[e] the desired effect[,]" it is sufficient to present the claimed violation to the jury. *Myers*, 331 U.S. at 483, 67 S. Ct. at 1338; *Szekeres v. CSX Transp., Inc.*, 617 F.3d 424, 429 (6th Cir. 2010).

¶24 From the evidence presented at trial, we conclude the District Court erred in refusing to submit Weber's LIA claim to the jury. Witness testimony indicated there would have been sufficient power to move the train through the tunnel if the two front locomotives had been working properly, even without supplemental assistance from the DP. The following dialogue during Conductor Ferguson's testimony is instructive:

> Q: So if the two engines on the head end of this train weren't able to move the train forward was there something wrong with those engines?

10

A: Yes.

MR. HEDGER: Objection, Your Honor, speculation foundation. Man is a conductor, Your Honor.

THE COURT: It's a rhetorical question. Obviously, if they are sufficient to move it and they don't move it, something is wrong.

Trainmaster Cullison, called as a witness by BNSF, also indicated the locomotives should have been able to pull the train through the tunnel after the DPs were isolated. He did not know the reason, but stated the locomotives did not have the capability to pull the train, and acknowledged that was "not how they are supposed to operate." Cullison testified the mechanical crew he had sent to the site could not determine "what was going on with the train" since, despite tests showing the locomotives "were making power," the train would not move when the throttle was activated.

¶25 The "intended service" of a locomotive is to provide power to move the train. Thus, the locomotive is not performing properly when it slows to a stop inside a tunnel without being commanded to do so by the engineer. As the default code listed on Weber's computer screen ultimately was determined to have indicated, the brakes actually were being applied to the DP on the rear end of the train without Weber's command. This testimony was sufficient to send the claimed LIA violation to the jury.

¶26 To prevail on her claim, Weber also was required to demonstrate that the LIA violation caused her injuries. In *CSX Transp., Inc.*, the Supreme Court clarified the appropriate standard of causation applicable in all FELA cases, concluding that the statutory standard of proof displaces common-law formulations of "proximate cause." *CSX Transp., Inc.*, ___ U.S. at ___, 131 S. Ct. at 2634. Under the FELA standard, the

11

jury must be instructed that if defendant's negligence "played a part—no matter how small—in bringing about the injury," the defendant is liable. Thus, "the carrier is answerable in damages even if the 'extent of the [injury] or the manner in which it occurred' was not 'probable' or 'foreseeable.'" *CSX Transp., Inc.*, ___ U.S. at ___, 131 S. Ct. at 2643-44 (bracketed material in original; internal citations omitted).

¶27    BNSF argues a plaintiff cannot recover for a violation of the LIA if the "violation upon which she relies creates an incidental condition or situation in which the accident, otherwise caused, results in injury." BNSF contends Weber's claim of injury is premised, not on a safety hazard presented by the locomotive, but on the incidental situation occurring when Trainmaster Cullison "ordered" that Weber stay on the train in the tunnel.

¶28    BNSF relies on Ninth Circuit authority in support of its argument. *Oglesby v. S. P. Transp. Co.*, 6 F.3d 603 (9th Cir. 1993). In *Oglesby*, a locomotive engineer suffered a back injury when he attempted to lift the seat in his locomotive. *Oglesby*, 6 F.3d at 604. Oglesby expected the seat would be secured by an L-shaped pin. Unbeknownst to Oglesby, the seat was secured to the pedestal by a permanent "roll" pin which made the seat incapable of being changed by persons other than roadhouse personnel. *Oglesby*, 6 F.3d at 604. Oglesby injured his back when he lifted and twisted the seat in an attempt to remove it. *Oglesby*, 6 F.3d at 604. He then brought an action alleging a violation of the Boiler Inspection Act ("BIA"), a precursor to the LIA. *Oglesby,* 6 F.3d at 605.

¶29    Relying on *Oglesby*, BNSF argues the mere fact that a defect exists does not end the LIA analysis. Instead, "the alleged defects must first be found to be unsafe in order to

12

constitute a violation of the [LIA]. Only once this finding has been made is a [LIA] violation established." *Oglesby*, 6 F.3d at 610. The Ninth Circuit noted it had found "no case in which a violation was established without a showing that the alleged defect created a safety hazard." *Oglesby*, 6 F.3d at 610. The U.S. District Court for the Eastern District of California later stated, "the Ninth Circuit has not since expounded on *Oglesby*'s requirements" but, citing similar cases, found "[i]n most of these cases, the courts have merely considered the inferences the jury might draw from the nature of the device or condition, rather than requiring any additional, specific evidence of hazard or peril." *Glow v. Union P. R.R. Co.*, 652 F. Supp. 2d 1135, 1144 (E.D. Cal. 2009).

¶30    *Oglesby*'s reference to a safety hazard arises from the unique factual circumstances of the case. When the defect of which the plaintiff complains involves the functioning of the locomotive, courts require the plaintiff simply to demonstrate the locomotive or appurtenance failed to perform properly in the intended service for which it was being used, and do not impose an added element requiring proof of a specific safety hazard. *See e.g. Southern Ry. Co*; *Grogg*. "The courts that have considered what showing a plaintiff must make to demonstrate that the condition of a device possesses an 'unnecessary danger of personal injury,' [as required by the statute,] have held that this is an issue of fact for the jury so long as there are some facts from which a jury could infer that such a danger existed." *Glow*, 652 F. Supp. 2d at 1144 (citing cases).

¶31    In *Oglesby*, the seat itself was not defective and unsafe, but merely secured in a manner unknown to Oglesby. The seat performed properly in that it was capable of being adjusted, albeit through different means. The Ninth Circuit, under those circumstances,

13

rejected the plaintiff's argument that a BIA violation could be "established by a mere showing that the seat did not work efficiently." Rather, the statute required the plaintiff to prove the seat was "unsafe." *Oglesby*, 6 F.3d at 610. Here, the evidence was not that Weber's locomotive was providing power in an alternate, but potentially proper and safe way. Rather, the locomotive allegedly failed to provide power to move the train forward at all. That allegation, if established, proves the railroad's failure to provide properly working equipment, creating a jury question as to unnecessary danger of personal injury due to the locomotive's disabled condition. We decline to expand the application of *Oglesby* beyond its particular facts.

¶32 BNSF argues nonetheless that Weber failed to prove her damages were proximately caused by a violation of the LIA, and the violation as alleged only set up an incidental condition for which intervening and independent factors produced injuries. The appropriate standard for causation, however, is whether violation of a safety statute "played any part, even the slightest, in producing the injury or death for which damages are sought." *Oglesby*, 6 F.3d at 606. As made plain by the Supreme Court in *CSX Transp., Inc.*, proximate cause is not the applicable standard of proof in FELA cases.

¶33 Weber presented sufficient evidence from which a jury could conclude that the locomotive's failure to propel the train through the tunnel created an unnecessary danger of exposure to carbon monoxide. We conclude this evidence, when viewed in the light most favorable to Weber, presented a factual issue whether the LIA had been violated and whether that violation played a part in causing Weber's injuries.

14

¶34 Accordingly, we reverse the District Court's grant of BNSF's motion to dismiss Weber's LIA claim. On retrial, the District Court's instructions to the jury should reflect that the plaintiff is entitled to a verdict on her LIA claim if she proves by a preponderance of the evidence that the locomotive was not in proper condition and safe to operate without unnecessary peril to life or limb, and that this condition played a part, no matter how small, in bringing about Weber's injuries.

¶35 *2. Whether the District Court erred in granting BNSF's motion to exclude testimony from Weber's treating physician about the results of the PET scan.*

¶36 Dr. Batty's testimony at trial was presented by deposition, which was taken prior to the District Court's rulings on BNSF's motion in limine. Dr. Batty indicated he relied on Dr. Alzheimer to read and interpret the PET scan. Dr. Batty testified he did not make any conclusions concerning the interpretation of the PET scan and acknowledged he did not have the foundation or expertise to do so. However, Dr. Batty testified that he did rely on the PET scan provided by Dr. Alzheimer in forming his diagnosis of the cause of Weber's injuries.

¶37 When BNSF renewed its motion in limine at trial, the District Court stated that though the scan results were consistent with carbon monoxide poisoning, "it's also consistent with a lot of other things." The court determined that the PET scan could not reasonably be relied upon because the scan does not necessarily indicate a cause and effect relationship between carbon monoxide poisoning and the results. Rather, the results of the PET scan could be consistent with other medical problems. The court expressed concern about the reliability and relevance of a PET scan in the context of this

15

case, particularly because it could not determine whether the PET scan "can rule in or rule out anything." Without Dr. Alzheimer's testimony that Dr. Batty's use of the PET scan was valid in this instance, the court determined there was insufficient evidence of its probative value.

¶38    M. R. Evid. 703 allows an expert to rely upon third-party generated data in forming his or her opinion. Reference to such data is admissible if it is "reasonably relied upon by experts" in that particular field. M. R. Evid. 703. Generally, "reports and opinions from other doctors are facts or data for purposes of Rule 703." *In re G.S.*, 215 Mont. 384, 389, 698 P.2d 406, 409-10 (1985). The data relied upon need not be admissible otherwise. *Klaus v. Hillberry*, 157 Mont. 277, 285-86, 485 P.2d 54, 58-59 (1971). However, while an expert may base his testimony on reasonably reliable information, he may not simply transmit the out-of-court statements or opinions of others without adding anything. Charles Alan Wright & Victor James Gold, *Federal Practice and Procedure* Vol. 29, § 6273, 311-12 (West 1997) (citing *United States v. Smith*, 869 F.2d 348, 355 (7th Cir. 1989)).

¶39    We review a district court's evidentiary ruling to determine not whether this Court would have made the same ruling, but whether the district court "acted arbitrarily without conscientious judgment or exceeded the bounds of reason" and prejudiced a substantial right of the appellant. *Seltzer v. Morton*, 2007 MT 62, ¶ 65, 336 Mont. 225, 154 P.3d 561. Here, in light of the District Court's concerns about the probity and reliability of the PET scan, the court put plaintiff's counsel on notice in its initial denial of BNSF's motion that Dr. Alzheimer should be called to lay the foundation for such evidence. Despite this

16

direction, plaintiff's counsel declined to call Dr. Alzheimer as a witness. Under such circumstances, we will not hold the District Court in error for refusing to allow Weber to admit the PET scan evidence through Dr. Batty.

¶40 Affirmed in part, reversed in part, and remanded for further proceedings consistent with this opinion.


/S/ BETH BAKER


We concur:

/S/ MIKE McGRATH
/S/ PATRICIA COTTER
/S/ MICHAEL E WHEAT
/S/ BRIAN MORRIS