FILED

June 23 2015

*Ed Smith*
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 14-0100

DA 14-0100

IN THE SUPREME COURT OF THE STATE OF MONTANA

2015 MT 167

TIMOTHY C. MARTIN,

      Plaintiff and Appellant,

  v.

BNSF RAILWAY COMPANY, a
Delaware corporation,

      Defendant and Appellee.

| APPEAL FROM: | District Court of the Thirteenth Judicial District,<br>In and For the County of Yellowstone, Cause No. DV 11-1682<br>Honorable Russell C. Fagg, Presiding Judge |
|---|---|

COUNSEL OF RECORD:

      For Appellant:

          Mark P. Dupont, Dupont Law Firm; Bigfork, Montana

      For Appellee:

          Jeff Hedger, Benjamin O. Rechtfertig, Hedger Friend, P.L.L.C.; Billings,
Montana

                        Submitted on Briefs:  December 17, 2014
                                    Decided:  June 23, 2015

Filed:

                                      Clerk

Justice James Jeremiah Shea delivered the Opinion of the Court.

¶1     Timothy C. Martin appeals from the order of the Thirteenth Judicial District Court, Yellowstone County, denying his motion for judgment as a matter of law,[1] and his motion for a new trial. We affirm in part, reverse in part, and remand for a new trial consistent with this opinion.

¶2     The issues on appeal are as follows:

1. *Whether the District Court erred by allowing Martin's Locomotive Inspection Act claim to be considered by the jury.*

2. *Whether the District Court abused its discretion by excluding evidence of heated platforms at BNSF's Whitefish and Essex depots.*

3. *Whether the District Court abused its discretion by admitting into evidence the specific amount of income Martin made from his non-railroad employment.*

## PROCEDURAL AND FACTUAL BACKGROUND

¶3     Martin began working as a switchman/brakeman for BNSF on July 12, 2004. A few months later, Martin was promoted to conductor after completing the required training and exam. In December 2008, Martin was permanently assigned to work on the conductors' extra board in Whitefish. The extra board is a list of conductors who fill in on an as-needed basis for absent workers. Conductors on the extra board are guaranteed a daily rate of pay for remaining on the extra board and are paid a higher rate for actual trips made. On January 1, 2009, the guaranteed daily rate for conductors on the Whitefish extra board was $199.86; the trip rate was $364.98.

---

[1] Martin and the District Court refer to his motion as a "Motion Notwithstanding the Verdict." Martin made his motion pursuant to M. R. Civ. P. 50, which references a "Motion for Judgment as a Matter of Law." We therefore refer to Martin's motion as such in this opinion.

¶4     On January 1, 2009, Martin was called into work at 1:05 a.m. at BNSF's Whitefish yard to work a priority z-train to Havre.  At the yard, Martin met up with his co-worker, locomotive engineer Randy Anderson.  After completing the required pre-trip paperwork, Martin and Anderson walked across the platform from the crew shanty to the train. Anderson boarded the locomotive before Martin.  Before stepping onto the locomotive, Martin observed a small amount of ice and snow on the locomotive steps.  As Martin climbed the steps of the locomotive, his foot slipped.  Martin asserts that as he fell back towards the platform, his left foot came down on a berm of snow which had accumulated between the platform and the locomotive steps, causing his knee to twist and resulting in a tear of his left anterior cruciate ligament (ACL).  Martin's injury required surgery and physical therapy and prevented performance of his duties as a conductor between January 19, 2009, and June 15, 2009.

¶5     Before working for BNSF, Martin worked in law enforcement.  Martin's law enforcement experience included working as a sheriff's deputy in Roosevelt County and in undercover drug investigations in Yellowstone County.  Martin has a master's degree in criminal justice administration.   From 2006 until 2010, Martin performed law enforcement related consulting work for the Chippewa-Cree Tribe.

¶6     Martin filed suit against BNSF on December 8, 2011, under the Federal Employers' Liability Act (FELA), 45 U.S.C. § 51 et seq., alleging negligence.  The jury returned a verdict in favor of BNSF on negligence and strict liability claims for violations of the Locomotive Inspection Act (LIA), 49 U.S.C. § 20701.  On November 20, 2013, Martin filed a motion for judgment as a matter of law under M. R. Civ. P. 50, and, in the

alternative, a motion for a new trial pursuant to M. R. Civ. P. 59. On January 31, 2014, the District Court filed an order denying Martin's motion.

¶7 Martin appeals the judgment of the District Court.

## STANDARDS OF REVIEW

¶8 We review de novo a district court's grant or denial of a motion for judgment as a matter of law. When reviewing the grant or denial of a motion for judgment as a matter of law, we apply the same standards as the district court. *Weber v. BNSF Ry. Co.*, 2011 MT 223, ¶ 16, 362 Mont. 53, 261 P.3d 984. Judgment as a matter of law is properly granted only when there is a complete absence of any evidence which would justify submitting an issue to a jury. All such evidence, and any legitimate inferences that might be drawn from the evidence, must be considered in the light most favorable to the party opposing the motion. *Weber*, ¶ 16 (citing *Johnson v. Costco Wholesale*, 2007 MT 43, ¶ 13, 336 Mont. 105, 152 P.3d 727).

¶9 The standard of review for discretionary trial court rulings is abuse of discretion. This standard may be applied to post-trial motions, such as motions for a new trial made pursuant to M. R. Civ. P. 59. *In re Johnson*, 2011 MT 255, ¶ 12, 362 Mont. 236, 262 P.3d 1105.

¶10 "This Court reviews evidentiary rulings for an abuse of discretion. A trial court has broad discretion to determine whether evidence is relevant and admissible. Absent a showing of an abuse of discretion, the trial court's determination will not be overturned." *Mickelson v. Mont. Rail Link, Inc.*, 2000 MT 111, ¶ 35, 299 Mont. 348, 999 P.2d 985. A district court commits an abuse of discretion when it acts arbitrarily without

4

conscientious judgment or exceeds the bounds of reason. If we determine that a district court abused its discretion, we must next determine whether the abuse of discretion constitutes reversible error. No reversible error occurs unless a substantial right of the appellant is affected, nor does reversible error occur unless the evidence in question was of such character as to have affected the outcome of the trial. *United Tool Rental, Inc. v. Riverside Contr., Inc.*, 2011 MT 213, ¶ 10, 361 Mont. 493, 260 P.3d 156.

## DISCUSSION

¶11  *1. Whether the District Court erred by allowing Martin's Locomotive Inspection Act claim to be considered by the jury.*

¶12  The FELA "renders railroads liable for employees' injuries or deaths 'resulting in whole or in part from [carrier] negligence.'" *CSX Transp., Inc. v. McBride*, ___U.S.___, 131 S. Ct. 2630, 2634 (2011) (quoting 45 U.S.C. § 51). Coupled with the FELA are numerous safety acts, including the LIA (previously the Boiler Inspection Act), and the Safety Appliance Act. *Urie v. Thompson*, 337 U.S. 163, 189–90, 69 S. Ct. 1018, 1034 (1949). The safety acts do not operate as a separate cause of action themselves, but "supplement[] the Federal Employers' Liability Act by imposing on interstate railroads 'an absolute and continuing duty' to provide safe equipment." *Urie*, 337 U.S. at 188, 69 S. Ct. at 1034 (citing *Lilly v. Grand Trunk W. R.R. Co.*, 317 U.S. 481, 485, 63 S. Ct. 347, 351 (1943)). Thus, injured railroad employees may seek recovery under the FELA for violations of these safety acts. *Weber*, ¶ 20 (citing *Dallas v. Burlington N., Inc.*, 212 Mont. 514, 520, 689 P.2d 273, 276 (1984)). A railroad may breach its duty under the LIA not only by violating the statute itself, 49 U.S.C. § 20701(1), but also by

5

failing to comply with pertinent Federal Railroad Administration (FRA) regulations. *McGinn v. Burlington N. R.R. Co.*, 102 F.3d 295, 299 (7th Cir. 1996). An FRA defect may constitute a violation of the LIA, thus giving rise to strict liability under the LIA.

¶13    To prevail on an LIA claim, a railroad employee must demonstrate both that the LIA has been violated and that the violation caused the employee's injuries. *Weber*, ¶ 22. The employee's burden of proof differs in a FELA case when the claim is premised on a violation of the LIA or an applicable regulation. The FELA requires a showing of negligence, whereas the LIA requires proof of a statutory or regulatory violation. *Weber*, ¶ 22.

> When a plaintiff alleges that a railroad has violated a federal safety statute, the Supreme Court has 'extended the reach of the principle of negligence *per se* to cover injuries suffered by employees as a result of their employers' statutory violations, even if the injuries sustained were not of a type that the relevant statute sought to prevent.'

*Weber*, ¶ 22 (citing *Consol. Rail Corp. v. Gottshall*, 512 U.S. 532, 543, 114 S. Ct. 2396, 2404 (1994)). If the employee establishes a violation of the LIA, the negligence requirement of the FELA claim is established as a matter of law. *Weber*, ¶ 22.

¶14    "The LIA should be 'liberally construed' in light of its primary purpose to protect employees and require the use of safe equipment." *Weber*, ¶ 21 (citing *Lilly*, 317 U.S. at 486, 63 S. Ct. at 351). The LIA states in pertinent part that "[a] railroad carrier may use or allow to be used a locomotive or tender on its railroad line only when the locomotive or tender and its parts and appurtenances . . . are in proper condition and safe to operate without unnecessary danger of personal injury." 49 U.S.C. § 20701(1). The applicable safety regulation at issue in this case requires that "[f]loors of cabs,

6

passageways, and compartments shall be kept free from oil, water, waste or any obstruction that creates a slipping, tripping or fire hazard." 49 C.F.R. § 229.119(c).

¶15     Martin argues that because he proved the presence of ice and snow on the steps of the BNSF locomotive, which he argues is a slipping hazard and a violation of 49 C.F.R. § 229.119(c), BNSF is liable under the LIA as a matter of law. BNSF argues that whether ice and snow was a violation of 49 C.F.R. § 229.119(c) was a proper question for the jury, citing *Gregory v. Mo. Pac. R.R.*, 32 F.3d 160 (5th Cir. 1994). In *Gregory*, there was conflicting testimony regarding the presence and amount of oil on a locomotive floor. The Fifth Circuit held that whether or not the oil constituted a slipping hazard was a question of fact, and therefore a question for the jury. *Gregory*, 32 F.3d at 162–63.

¶16     It is axiomatic that if, in fact, Martin slipped on the ice and snow on the locomotive steps, then the ice and snow were a slipping hazard. However, even assuming Martin established, as he contends, the presence of the ice and snow on the locomotive steps, he did not conclusively establish that the ice and snow caused him to slip. Evidence was presented to the jury that the snow and ice on the locomotive steps did not cause Martin to slip. Martin himself testified at trial that he observed only "a little bit" of ice and snow on the steps, and he did not know if it contributed to him slipping on the steps. Martin's attorney conceded at trial that there was conflicting evidence about ice and snow on the locomotive steps, and that it was a proper jury question. Viewed in a light most favorable to BNSF, evidence existed to support the jury's determination that BNSF was not liable for Martin's injury due to the presence of

ice and snow on the locomotive's steps. The District Court did not err by allowing Martin's LIA claim to be considered by the jury.

¶17 *2. Whether the District Court abused its discretion by excluding evidence of heated platforms at BNSF's Whitefish and Essex depots.*

¶18 At the time of Martin's injury, the Whitefish platform was not heated. After Martin's injury, Amtrak used federal stimulus money to install a heated platform at Whitefish. BNSF filed a motion in limine requesting the District Court exclude evidence that the Whitefish platform is now heated, arguing it was inadmissible as a subsequent remedial measure. The District Court granted BNSF's motion in limine.

¶19 "When, after an injury or harm allegedly caused by an event, measures are taken that, if taken previously, would have made the injury or harm less likely to occur, evidence of the subsequent measures is not admissible to prove negligence [or] culpable conduct." M. R. Evid. 407.

¶20 Martin argues that because the heated platform at Whitefish was installed by Amtrak, M. R. Evid. 407 does not apply, citing *Stevens v. Novartis Pharms. Corp.*, 2010 MT 282, 358 Mont. 474, 247 P.3d 244. In *Stevens*, we held: "M. R. Evid. 407 does not prohibit evidence of subsequent remedial measures taken by non-parties." *Stevens*, ¶ 93. In response, BNSF neither substantively addresses nor attempts to distinguish *Stevens* other than to argue that *Stevens* "is a different situation" because, in the present case: "[T]he platform in question was BNSF's platform on BNSF's property used by BNSF's employees (the other end of the platform was used by Amtrak)." Assuming for the sake of argument that this contention was sufficient to distinguish our holding in

8

*Stevens* from this case, BNSF fails to cite to anything in the record in support of its contention. The only evidence in the record regarding ownership of the platform to which we are cited is the representations of BNSF's attorneys during arguments on this motion in limine, in which they represented to the District Court: "[I]t's an AmTrak [sic] platform" and "[I]t was AmTrak [sic] platforms, federal money. AmTrak [sic] was the reason that they got – that they [installed the heated platform]."

¶21 Moreover, irrespective of the ownership of the platform, there does not seem to be any dispute in the record that the act of installing the heated platform at Whitefish was taken by Amtrak and not BNSF.[2] Therefore, if in fact this did constitute a subsequent remedial measure, it was nevertheless a measure taken by a non-party—Amtrak. As Martin correctly noted, we have previously held that "M. R. Evid. 407 does not prohibit evidence of subsequent remedial measures taken by non-parties." *Stevens*, ¶ 93. The District Court's exclusion of evidence of the heated platform at Whitefish as a subsequent remedial measure, therefore, was in error. Because we remand for a new trial on Issue Three, we need not determine whether the exclusion of this evidence prejudiced Martin.

¶22 Martin next argues that the District Court erred when it excluded evidence of the heated platform at the BNSF yard in Essex. The heated platform at Essex would not constitute a subsequent remedial measure because it was already installed at the time of Martin's injury. Martin argues on appeal that evidence of the Essex platform was

---

[2] Although BNSF states in its brief on appeal that "BNSF took part in the construction of its end of the platform," BNSF again fails to cite any portion of the record in support of this statement. M. R. App. P. 12(1)(f) requires that when presenting an argument, the parties must cite to "the authorities, statutes, and pages of the record relied on."

admissible to show feasibility of such measures and for impeachment. BNSF responds that the District Court properly excluded evidence of the Essex platform as irrelevant. BNSF further argues that notwithstanding the District Court's exclusion of this evidence, it advised Martin's attorney that he was allowed to engage in "fairly rough" cross-examination of BNSF's witnesses on the feasibility of heated platforms, which Martin chose not to do. BNSF therefore argues: "Any error created by the District Court in not allowing evidence of the heated platforms is harmless where, as here, the Court provided Martin an alternate method of garnering the information, and he simply chose not to pursue it." We agree.

¶23 As it pertains to the Essex platform, we cannot fault the District Court for declining to prospectively rule that evidence of the heated platform at Essex was relevant before it could even assess the context in which the evidence might be offered. As BNSF correctly notes, when addressing the scope of Martin's cross-examination on the issue of heated platforms, the District Court specifically advised Martin's counsel that it may be proper grounds for cross-examination to ask "[C]ouldn't you shovel better? Couldn't you use salt? *Couldn't you put in a heated platform?*" (Emphasis added.) The District Court concluded: "Maybe there's a point where you can't take it any further, but I kind of let cross-examination be fairly rough." Although Martin's attorney conceded that the District Court's ruling was "fair," Martin did not engage in any cross-examination of BNSF's witnesses regarding heated platforms. Thus, he did not afford the District Court the opportunity to assess whether he had reached the point where he could not "take it any further." Martin argued evidence of the heated platform at Essex was admissible to

10

show the feasibility of a heated platform being installed at Whitefish at the time of his injury. The District Court's ruling recognized that such evidence would only become relevant once BNSF contended such a measure was *not* feasible. This was the specific line of inquiry the District Court allowed Martin to pursue and which he chose not to do.[3] Under these circumstances, the District Court did not abuse its discretion.

¶24    *3. Whether the District Court abused its discretion by admitting into evidence the specific amount of income Martin made from his non-railroad employment.*

¶25    Before trial, Martin filed a motion in limine requesting the District Court exclude any references to his outside consulting employment and "[a]ny reference to monies earned by Martin as a consultant with Tim Martin Law Enforcement." The District Court denied Martin's motion in limine on this issue.

¶26    Martin argues that the District Court erred by admitting the specific amounts he earned from his non-railroad employment, when the proper measure of his economic loss was what he was earning at BNSF on the date of his injury, citing *Adskim v. Or-Wash. R.R. & Nav. Co.*, 294 P. 605, 610 (Or. 1930) (in an FELA case, the wages plaintiff was receiving at the time of injury is the proper basis upon which to measure the amount of damages he was entitled to recover as lost wages). Martin also argues that he

---

[3] Martin argues in his reply brief that neither of the two witnesses BNSF called in its case-in-chief could have testified about BNSF's snow removal policies because that was not their area of responsibility. Martin contends that BNSF's decision to not call the witness who could testify about snow removal policies precluded any cross-examination on the subject. Because Martin did not ask either of BNSF's witnesses any questions about snow removal policies, however, we can only speculate that they would have testified that they had no knowledge on the subject.

was unfairly prejudiced by the disclosure of the income he made from his consulting business.

¶27 BNSF argues that evidence of Martin's non-railroad employment was admissible for two reasons: (1) Martin could not have made himself available to work on a train every day while simultaneously working 40 hours per week elsewhere; and (2) Martin had no motivation to make himself available to work every day of the week because he was earning $80,000 to $90,000 per year in his other job. To the extent that there may have been error, BNSF argues that any error was harmless because the evidence of Martin's non-railroad employment went only to damages and, since the jury did not find BNSF liable for Martin's injuries, damages were not an issue.

¶28 To the extent that the demands on Martin's time from his non-railroad employment may have restricted his availability to work the conductors' extra board, evidence of this nature was admissible. Indeed, in his counsel's colloquy with the District Court on this issue, Martin's attorney conceded: "If they want to ask him, were you working outside, that's fine. But to bring up the dollar amount he's making out there? There's no reason that has to come in." Although acknowledging that the evidence of Martin's non-railroad income was "very prejudicial," the District Court nevertheless concluded that it was admissible to provide context for the jury.

¶29 Assuming for the sake of argument that Martin's non-railroad income during the time he was off injured had some limited probative value, BNSF's use of this evidence at trial went far beyond this theoretically limited value. BNSF and Martin stipulated at trial that he was unable to physically perform his railroad duties from January 19, 2009 to

June 15, 2009. Yet during trial, BNSF repeatedly brought up Martin's outside consulting business and the wages he earned from that business—not just during the months in 2009 when Martin was off injured—but also for the years 2006, 2007, 2008, all of 2009, including the months Martin was not off injured, and 2010. In his opening statement, BNSF's counsel told the jury that, from his consulting business, Martin earned approximately $84,000 in 2008 (the year *before* his injury), that he earned almost $90,000 (it was actually $84,060) in 2009 (the year of his injury), and that he earned almost $90,000 in 2010 (the year *after* his injury). During trial, over Martin's objections, BNSF introduced invoices that Martin submitted to the Chippewa-Cree Tribe both for his hours worked and his expense reimbursements. The BNSF also introduced, over Martin's objections, Schedule C from Martin's 2008, 2009, and 2010 tax returns. In closing argument, BNSF's counsel argued to the jury:

> I'm not faulting him for having a job that pays him 80 to 90 thousand dollars. But there was no motivation for him to work as heavily as he claims.

¶30  We have previously held that the introduction into evidence of outside sources of income for the purpose of suggesting to the jury that a plaintiff had a motive for not working was so prejudicial as to require reversal. *Mydlarz v. Palmer/Duncan Constr. Co.*, 209 Mont. 325, 682 P.2d 695 (1984); *Mickelson v. Mont. Rail Link*, 2000 MT 111, 299 Mont. 348, 999 P.2d 985. Although *Mydlarz* and *Mickelson* both involved the plaintiff's receipt of workers' compensation benefits, we cannot reconcile disallowing evidence of wage replacement benefits being offered to show a lack of motivation to work—as we have consistently done in the past—with allowing evidence of wages from

13

separate employment being offered to show a lack of motivation to work, as was done in this case.

¶31 BNSF argues that cases such as *Mydlarz* and *Mickelson* are inapposite to the case before us because they involved collateral source payments as opposed to earnings from separate employment. In seeking to distinguish these cases, BNSF contends: "The exclusion of collateral source benefits at trial serves the purpose of encouraging individuals to purchase and maintain liability insurance by eliminating the prejudicial impact of such evidence." This statement illustrates the infirmity of BNSF's argument that Martin's non-railroad income was admissible. Certainly, encouraging individuals to seek and maintain gainful employment serves as important a purpose as encouraging them to draw on a collateral source benefit such as workers' compensation. It makes little sense, then, that we would exclude evidence of the latter because of its prejudicial impact, but allow evidence of the former.

¶32 M. R. Evid. 403 provides in pertinent part: "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice." "Relevant evidence means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable." M. R. Evid. 401. It is questionable whether evidence of the amount of money Martin earned at his non-railroad employment—much less the amount he was reimbursed for his expenses—during extended time periods both before and after his injury, would have any tendency to make the existence of his wage loss during a discrete five month period in 2009 any more or less probable. Even if we were to assume

14

some relevancy to such evidence, however, as the District Court recognized, this evidence was "very prejudicial." For similar considerations that we disallowed such evidence in *Mydlarz* and *Mickelson*, we conclude it was error to admit it in this case.

¶33 Regarding BNSF's argument that the error was harmless because the jury found BNSF was not liable, we rejected this same argument in *Mickelson*, in which we recognized "that such evidence can have an impact upon a jury's verdict on the issue of liability, as well as damages." *Mickelson,* ¶ 46. We have held: "The test of prejudicial error requiring reversal is whether there is a reasonable possibility the inadmissible evidence might have contributed to the verdict." *Boude v. Union Pac. R.R. Co.*, 2012 MT 98, ¶ 21, 365 Mont. 32, 277 P.3d 1221 (quoting *Pacificorp v. Dep't. of Revenue*, 254 Mont. 387, 398, 838 P.2d 914, 920 (1992)). In this case, much of BNSF's argument to the jury was essentially that, irrespective of his injury, Martin suffered no damage because he had substantial outside income. We cannot say there is not a reasonable possibility the inadmissible evidence of Martin's non-railroad income contributed to the verdict.

## CONCLUSION

¶34 The District Court did not err by allowing the issue of whether the BNSF violated the LIA to go to the jury. The District Court erred by excluding evidence of the installation of the heated platform at Whitefish as a subsequent remedial measure. The District Court did not err by excluding evidence of the heated platform at Essex. The District Court erred by allowing any evidence of Martin's income and expense reimbursements from his non-railroad employment. This error was not harmless.

¶35 Affirmed in part, reversed in part, and remanded for a new trial consistent with this opinion.

/S/ JAMES JEREMIAH SHEA

We Concur:

/S/ MIKE McGRATH
/S/ PATRICIA COTTER
/S/ BETH BAKER

Justice Laurie McKinnon, concurring in part and dissenting in part.

¶36 I disagree with the Court's resolution of Issues Two and Three. I agree with the Court's resolution of Issue One, but nevertheless find parts of the Court's analysis troubling. Preliminarily, however, proper resolution of Issues Two and Three turns on adherence to the standard of review. A district court's evidentiary rulings are reviewed for an abuse of discretion. An abuse of discretion is not whether this Court would have reached the same decision, but whether the district court "acted arbitrarily, without employment of conscientious judgment, or exceeded the bounds of reason resulting in substantial injustice." *Colstrip Energy L.P. v. Nw. Corp.*, 2011 MT 99, ¶ 18, 360 Mont. 298, 253 P.3d 870.

¶37 Martin filed a motion in limine arguing against BNSF's use of evidence of earnings from his law enforcement consulting business for services provided to the Rocky Boy Tribe between March 2006 and February 2011. More specifically, BNSF maintained that Martin's employment with BNSF was secondary to his consulting services, and that this was demonstrated by examining the inverse relationship between

16

an increase in earnings from consulting and a decrease in earnings from BNSF. BNSF also maintained that the earnings from Martin's consulting business demonstrated that Martin had no incentive to work for BNSF. Martin argued that BNSF should be limited to only his wage history with BNSF and that BNSF should not be allowed to use earnings from his outside employment to contest his wage-loss claim. However, Martin agreed that BNSF could use several years of BNSF wage history in disputing his wage loss.

¶38 BNSF wanted to demonstrate a trend in Martin's work history and show that, based upon this history, his claim for earnings for the six-month period following his injury was inflated and exaggerated. Specifically, BNSF argued that: (1) Martin was not available to work full-time for BNSF because he was working full-time in his consulting business, and (2) Martin had an incentive, and indeed had actually chosen, to work for the more lucrative job, given the finite number of hours he was available to work. BNSF maintained that Martin's earnings from consulting demonstrated that he was actually working 40 hours per week in consulting and averaging 50,000 miles of travel for the years 2008, 2009, and 2010. In each of those years, Martin earned $80,362, $84,060, and $90,663, respectively, from his consulting business. BNSF argued that, consequently, Martin could not have worked full-time for BNSF. Additionally, the most Martin ever earned from BNSF for any given year during this timeframe was in 2010, when he earned $30,613. BNSF sought to show that Martin's wage-loss claim of $31,500 for a six-month period in 2009 did not fairly represent this work history. BNSF maintained that the amount of Martin's earnings was very probative and relevant to establish that his claim was over-inflated.

¶39 The District Court considered these arguments and appreciated the unique circumstances of the case before it. Indeed, the court observed that Martin's earnings from his consulting business were "incredible" and commented "that [it was] a pretty good consulting job." The Court recognized that the evidence was "very prejudicial," but nevertheless concluded that the jury needed to place Martin's wage-loss claim in context, and the matter was best left for cross examination.

> I understand you have an objection, but to me that is the context—the jury needs to understand this—I understand the prejudicial value, but I think we need to have the context. You know, we need to talk about the year or two prior, the consulting job, and how it affected his wages when he was off work because of this accident and whether it did or didn't, you argue it did; they argue it didn't, or maybe it didn't as much as you think it did. I think the jury has a right to know that, and including the dollar amount. I get the fact that, hey, the jury is going to go, geez, but I think they need to understand that, the big picture there.

¶40 The parties and the District Court appreciated that Martin's wage trend and work history were relevant in determining whether Martin was entitled to damages in the full amount of $31,500, which would reflect annual earnings of $63,000 at BNSF. Martin never argued to the District Court that evidence of BNSF wages earned, for example in 2008, were not relevant. At any point in time during which Martin had earnings from his consulting business, Martin's BNSF wages were no higher than $30,613. The District Court appreciated this and allowed the evidence to be used to demonstrate this particular point, given the unique circumstances of Martin's "secondary employment."

¶41 The Court's decision that the evidence was nevertheless inadmissible is at odds with the standard of review we must employ in resolving evidentiary issues. The District

18

Court appreciated the arguments of counsel and the unique relationship between Martin's employment history and his wage-loss claim. Similarly, the District Court was committed to letting the jury resolve the dispute and providing them with the evidence to place the claims in proper context. In my opinion, we construe the issue too narrowly and fail to appreciate the arguments made by BNSF as to the relevance of the evidence.

¶42 The Court also is mistaken in drawing a comparison to the collateral source rule. Pursuant to the collateral source rule, when an injured plaintiff has been compensated for his injuries from a collateral source, the defendant may not benefit from that recovery. *Mickelson v. Mont. Rail Link, Inc.*, 2000 MT 111, ¶ 38, 299 Mont. 348, 999 P.2d 985. However, Martin did not receive compensation from his consulting business for his injury. Instead, he received compensation for hours and amounts billed, which arguably demonstrates that he was not available to work full-time as required to substantiate his six-month wage-loss claim. Furthermore, the exclusion of collateral source benefits has the purpose of encouraging individuals to purchase and maintain liability insurance. This purpose does not extend to the current circumstances. The Court misapplies the collateral source rule to the facts of these proceedings and fails to recognize the subtleties, which the District Court appreciated, implicit in BNSF's argument regarding the relevancy of the evidence. Just because the evidence is prejudicial does not mean it should be excluded. I would affirm the District Court, finding that it did not abuse its discretion in allowing the jury to consider evidence of Martin's earnings from his consulting business.

¶43 As I would affirm the District Court on Issue Three, it is necessary for me to set forth my position regarding Issue Two, concerning evidence of the heated platform.

19

BNSF moved in limine to exclude evidence that the Whitefish platform was reconstructed after Martin's injury to include a heating element. BNSF argued two reasons for why the evidence ought to be excluded: (1) the evidence was impermissible as a subsequent remedial measure pursuant to M. R. Evid. 407, and (2) evidence of the heated platform was irrelevant because Martin had slipped off the steps and not the platform. BNSF also objected to references to another heated platform in Essex on the basis that it was irrelevant. Martin argued that Amtrak, not BNSF, installed the heated platform, and that BNSF lacked standing to seek exclusion of references to the heated platform as a subsequent remedial measure.

¶44 Prior to trial, the District Court indicated it would be granting BNSF's motion, stating that it thought the heated platform was a subsequent remedial measure. During a break in Martin's case, the District Court revisited its ruling after hearing further argument from counsel and considering testimony from several of Martin's witnesses, and issued the following ruling:

> I guess it feels like we're getting far afield. I haven't heard Mr. Martin testify yet, but you know, from the first, I think it was his partner, Mr. Anderson, or the engineer, he didn't really talk about the berm being any real problem, and the slip and fall was actually from the step, so we're kind of removed from the step. We're talking about the berm; we're talking about an action after the incident in question. It, you know, occurs to me— I mean, the heated platform is after the incident in question. . . . [T]he bigger issue is the plowing or if you have to use hand shovels to take out—I mean, I understand if there's a big berm . . . I can see the danger of that, but I'm not getting any sense that's what we're talking about here.

Following more discussion with counsel, the court stated:

And you can talk about that, and I think you can talk about that BNSF had an obligation to make sure the berm wasn't there or provide a reasonably safe workplace. It just seems like to me it's a big leap to get to heated platforms. That's one thing that BNSF potentially could have done, and if they had, apparently somebody is going to testify that there is no berms in that situation, but it just occurs to me that it's removed from the facts of our case.

Following more argument and discussion with counsel, the court concluded that it was "proper grounds for cross examination. You know, couldn't you shovel better? Couldn't you use salt? Couldn't you put in a heated platform?" Martin's counsel agreed and said: "That's fair. They're sitting there saying, and I think you're [District Court] probably right to that extent, that if they're going to sit there and say we did all we could do, we've done what's reasonable, then I have the right to cross."

¶45 Martin's counsel never followed through with any cross examination regarding the topic of heated platforms. Assuming there was error created by the District Court in not allowing evidence of the heated platforms, the error is harmless where, as here, the court allowed Martin an alternate method of garnering the information. *Williams v. Bd. of Cnty. Comm'rs*, 2013 MT 243, ¶ 35, 371 Mont. 243, 308 P.3d 88. Nevertheless, the Court fails to appreciate that, while we observed in *Stevens v. Novartis Pharmaceuticals Corp.*, 2010 MT 282, ¶ 93, 358 Mont. 474, 247 P.3d 244, that M. R. Evid. 407 does not prohibit evidence of subsequent remedial measures taken by non-parties, evidence nevertheless must still be relevant to be admissible. M. R. Evid. 402. It is clear from the District Court's discussion with the parties and its order that it did not believe the evidence was relevant and that it went "far afield." Although it appears unclear from the record the extent of BNSF's involvement with stimulus money apparently used by

21

Amtrak to build the platform, the record is abundantly clear that the District Court determined the evidence was not relevant to the circumstances of Martin's slip from the locomotive steps. Given the standard of review to be applied and the record of the court's consideration and discussion of the issue, I cannot conclude that the District Court "acted arbitrarily, without employment of conscientious judgment, or exceeded the bounds of reason resulting in substantial injustice." *Colstrip*, ¶ 18.

¶46 As a final observation, I cannot agree with the Court's declaration that "[i]t is axiomatic that if, in fact, Martin slipped on the ice and snow on the locomotive steps, then the ice and snow were a slipping hazard." Opinion, ¶ 16. This appears to contradict the remaining portion of the paragraph, wherein the Court observes all the reasons why ice and snow do not conclusively establish a slipping hazard. I agree that the District Court did not err in denying Martin's motions for judgment as a matter of law regarding Martin's LIA claim. The evidence clearly supported sending the issue to the jury for its consideration.

¶47 For the foregoing reasons, I would affirm the decision of the District Court.


/S/ LAURIE McKINNON